UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| RANDY LEE RINDAHL,<br><br>Plaintiff,<br><br>vs.<br><br>TIM REISCH, IN HIS INDIVIDUAL CAPACITY; DOUG CLARK, IN HIS INDIVIDUAL CAPACITY; DAN SULLIVAN, IN HIS INDIVIDUAL CAPACITY; TROY PONTO, DEPUTY WARDEN, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; JOHN BENTING, ASSOC. WARDEN, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; C. ROTERT, EX-ASSOC. WARDEN / CCM, IN HIS OR HER INDIVIDUAL AND OFFICIAL CAPACITY; ELLIS, SECTION MANAGER, IN HIS OR HER INDIVIDUAL AND OFFICIAL CAPACITY; T. SCHNEIDER, SECTION MANAGER, IN HIS OR HER INDIVIDUAL AND OFFICIAL CAPACITY; M. JONES, DISCIPLINARY HEARING OFFICER, IN HIS OR HER INDIVIDUAL AND OFFICIAL CAPACITY; GTEL/GLOBAL TEL LINK CORPORATION; KELLIE WASKO, IN HER OFFICIAL CAPACITY; SAMUEL YOST, IN HIS INDIVIDUAL CAPACITY; AND JOSEPH ROEMMICH, IN HIS OFFICIAL CAPACITY,<br><br>Defendants. | 4:22-CV-04073-RAL<br><br><br>OPINION AND ORDER GRANTING DOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff Randy Lee Rindahl, an inmate at the South Dakota State Penitentiary (SDSP), filed this pro se lawsuit under 42 U.S.C. § 1983 and other federal statutes. Doc. 1. This Court screened Rindahl's complaint under 28 U.S.C. § 1915A, dismissing the complaint in part and

directing service upon defendants in part. Doc. 12. The South Dakota Department of Corrections
(DOC) defendants move for summary judgment on the claims that remain pending against them.
Doc. 260. The remaining claims against the DOC defendants[1] are:

- First Amendment free speech claim regarding the SD DOC telephone policies against Roemmich[2] and Wasko in their official capacities for injunctive relief. Doc. 12 at 30, 55.

- First Amendment access-to-the-courts claim regarding Rindahl's alleged inability to bring lawsuits in Wisconsin and California against Roemmich and Wasko in their official capacities for injunctive relief. Id. at 31, 55.

- Eighth Amendment deliberate indifference to serious medical needs claims against Ponto and Benting in their individual capacities and in their official capacities for injunctive relief only. Id. at 35, 55. See also Doc. 236 at 6 (granting Rindahl's motion to remove defendants Dr. Carpenter, Cook, and Madsen). Because the Eighth Amendment deliberate indifference to serious medical needs claim against Sullivan in his official capacity for injunctive relief only survived screening, Roemmich, the current Warden of the SDSP, is substituted for Sullivan on the official capacity claim for injunctive relief only. See supra n.2.

- Eighth Amendment deliberate indifference to serious medical needs claims against Clark and Sullivan in their individual capacities. Doc. 12 at 35, 55; see also Doc. 236 at 6 (granting Rindahl's motion to remove defendants Young and Dreiske).

- First Amendment free speech claims regarding disciplinary punishment against Sullivan, Ponto, Benting, Jones, Yost, Schneider, Ellis, Reisch, Clark, and Rotert in their individual capacities. Doc. 12 at 37–38, 56. See also Doc. 236 at 6 (granting Rindahl's motion to remove defendants Cook, Madsen, Young, Dreiske, and Badure).

## I.    Factual Background

The DOC defendants complied with Rule 56.1(A) of the District of South Dakota's Local
Rules by filing a statement of material facts along with their motion for summary judgment. Doc.

---

[1] Some of Rindahl's claims against Global Tel Link Corporation d/b/a ViaPath Technologies ("ViaPath") survived screening, Doc. 12, and this Court will issue a separate Opinion and Order on ViaPath's motion for summary judgment, Doc. 287.

[2] When Rindahl commenced this action, Dan Sullivan was the Warden of the SDSP. See Doc. 12 at 11 n.6. Joseph Roemmich is now the Warden of the SDSP. Roemmich is automatically substituted for Sullivan on Rindahl's official capacity claims. Fed. R. Civ. P. 25(d).

263; D.S.D. Civ. LR 56.1(A). Rindahl responded to Defendants' statement of material facts, but did not consistently include appropriate citations to the record as required by Federal Rule 56(c)(1)(A) and Local Rule 56.1(B). Doc. 277. At times, Rindahl relies only on the allegations in his complaint. Id. A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his or her pleading but "must set forth specific facts showing [the existence of] a genuine issue for trial." Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)); see also Moslev v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). However, to ensure that the facts are viewed in the light most favorable to Rindahl, as the non-moving party, this Court draws the facts from all the record evidence, including Rindahl's affidavit, exhibits, and other documentary evidence and filings relevant to the DOC defendants' motion for summary judgment. See, e.g., Doc. 1-1; Doc. 278; Doc. 279. This Opinion and Order, of course, makes no findings of fact and sets forth the facts in the light most favorable to Rindahl, as it must in ruling on the DOC defendants' motion for summary judgment.

## A.    First Amendment Free Speech Claim (Telephone Policies)

The Offender Access to Telephones and Tablets Policy No. 500-05 provides that inmates may have fifteen separate approved telephone numbers on the inmate's contact list. Doc. 261-1 at 2; Doc. 263 ¶ 2; Doc. 277 ¶ 2. In addition, inmates are permitted to contact approved numbers on a global call list available at each DOC facility. Doc. 262 ¶ 7. The warden may deny or terminate a person from an inmate's approved contact list "if it is determined the offender's communication with the person/telephone number poses, or may pose, a risk to safety or security or is contrary to the legitimate penological interests of the DOC." Doc. 261-1 at 3; Doc. 263 ¶ 3; Doc. 277 ¶ 3. An

inmate may appeal the denial or termination of a person from the inmate's approved contact list using the grievance process set forth in the Grievance Procedure Policy No. 500-04. Doc. 261-1 at 3; Doc. 263 ¶ 4; Doc. 277 ¶ 4. Restricting the number of telephone numbers on an inmate's contact list enables the DOC to monitor inmates' telephone conversations, prevents inmates from contacting crime victims and known criminal associates, and minimizes the opportunity to conspire with individuals outside of prison to smuggle contraband, tamper with witnesses, or engage in organized criminal activity. Doc. 262 ¶ 9; Doc. 263 ¶ 5; Doc. 277 ¶ 5.

### B.   First Amendment Access-to-the-Courts Claim

Rindahl alleges that the insufficient legal materials at DOC facilities interfered with his ability to litigate matters in Wisconsin and California. Doc. 1 at 6–13; Doc. 9 at 6–13. He alleges that the DOC discarded physical copies of the United States Code and all "South Dakota Codified Law Publications" to intentionally deprive him and other inmates of access to legal materials. Doc. 1 at 6–7.

### C.   Eighth Amendment Deliberate Indifference to Serious Medical Needs Claim

#### 1.   Broken Left Jaw

Rindahl alleges that x-rays of his left jaw after a 2014 assault by correctional personnel were falsified because the report refers to the right mandibular and jaw pain rather than left. Doc. 1 at 15. He contends that his left jaw injury has caused headaches and numbness, but that he has not received treatment for the injury. Id. at 15–16. Rindahl attached a copy of the 2014 radiology report as an exhibit to his complaint. Doc. 1-1 at 31. The report states that "[n]o specific mandible lesion [was] identified." Id. On July 30, 2014, a Correctional Health Services provider, who is not a defendant, handwrote "[n]o abnormality noted" on the 2014 radiology report. Id.

4

### 2.    Vessel Ischemic Disease

Prior to February 22, 2022, Rindahl presented at nursing sick calls complaining of headaches and balance and vision issues. Doc. 278 at 6. On February 22, 2022, Rindahl was transported to Avera McKennan Hospital for a CT scan of his head and neck. Doc. 261-14; Doc. 263 ¶ 16; Doc. 277 ¶ 16; Doc. 278 at 6. On March 10, 2022, Rindahl was seen in health services for a routine physical examination and to review the CT results. Doc. 261-15; Doc. 263 ¶ 17; Doc. 277 ¶ 17. The head CT demonstrated changes consistent with chronic small vessel ischemic disease. Doc. 261-15 at 2. The provider, who is not a defendant, discussed with Rindahl treatable risks factors to prevent brain ischemia, including hypertension, lipids, diabetes, and physical activity. Doc. 261-15 at 8; Doc. 263 ¶ 18; Doc. 277 ¶ 18. Rindahl confirmed that he understood the discussion. Doc. 261-15 at 8; Doc. 263 ¶ 18; Doc. 277 ¶ 18. The provider also educated Rindahl on lifestyle changes such as regular cardiovascular exercise, avoiding unnecessary intake of salt, sugar, and saturated fats, and continuing a heart healthy diet. Doc. 261-15 at 8.

Approximately six months later, on September 6, 2022, Rindahl was seen in health services for a chronic care visit related to prediabetes, hypertension, and asthma. Doc. 261-17 at 1–2; Doc. 263 ¶ 19; Doc. 277 ¶ 19. During this visit, Rindahl reported "episodes of feeling drunk[,]" which he attributed to his small vessel ischemia. Doc. 261-17 at 2. The provider, who is not a defendant, educated Rindahl "[i]n depth" on the ischemic changes noted on the CT scan, and encouraged lifestyle modifications and hypertension compliance. Id.; Doc. 263 ¶ 20; Doc. 277 ¶ 20. The provider did not attribute Rindahl's reported symptoms to his small vessel ischemia, but instructed him to follow up if the symptoms continued following an upcoming endocrinology appointment. Doc. 261-17 at 4.

Rindahl was seen in health services on January 23, 2023, and reported dizziness that he believed was caused by the chronic small vessel ischemic disease noted on the February 2022 CT scan. Doc. 261-18 at 2. The provider, who is not a defendant, again reviewed the CT results with Rindahl and explained that aging, as well as his chronic diseases, can lead to small vessel ischemic disease. Id. at 2–3. The provider also explained the importance of managing his chronic conditions to prevent vessel changes. Id. at 3. The provider referred Rindahl to physical therapy for balance issues and recommended a follow up if there was no improvement with physical therapy. Id. at 6. The provider reassured Rindahl that his CT scan showed no acute findings. Id.

In May 2022, Rindahl submitted an informal resolution request and request for administrative remedy complaining that he was not receiving any treatment for his ischemic vessel disease. Doc. 261-12 at 2, 4; Doc. 263 ¶ 26; Doc. 277 ¶ 26. In response, Rindahl was reminded that a provider had discussed the CT results with Rindahl, informed him of treatable risk factors, and outlined a treatment plan. Doc. 261-12 at 1, 3; Doc. 263 ¶ 27.

### 3. Thyroid Gland Nodules

When a provider met with Rindahl on March 10, 2022, to discuss the CT results, the provider also discussed thyroid gland nodules mentioned on the neck CT report. Doc. 261-15 at 2, 8. Doc. 263 ¶ 29; Doc. 277 ¶ 29. The provider informed Rindahl that thyroid labs had been ordered and that further imaging or testing, if appropriate, would be ordered after the labs were received. Doc. 261-15 at 8. Thyroid labs were drawn on March 14, 2022, and the results were normal. Doc. 263 ¶¶ 30, 31. On June 14, 2022, Rindahl underwent a thyroid ultrasound. Doc. 261-20 at 1; Doc. 263 ¶ 32; Doc. 277 ¶ 32. After the ultrasound, Rindahl was referred to an endocrinologist. Doc. 261-20 at 1; Doc. 261-22; Doc. 263 ¶ 33; Doc. 277 ¶ 33. During the endocrinology visit, a fine needle aspiration of the thyroid nodules was performed and revealed

the nodules were benign. Doc. 261-18 at 1. Nevertheless, health services planned to perform a yearly ultrasound of the thyroid nodules. Id. at 6.

### 4.    Stomach Wound

Rindahl alleges that he has a stomach wound that has not been properly managed, resulting in pus or bowel-like discharge that is ongoing. Doc. 1 at 21–22. Rindahl, in accordance with D.S.D. Civ. LR 56.1(B), responded to the DOC defendants' statement of undisputed material facts. Doc. 277. One of the pages of Rindahl's response, page 18, is missing from the record. It appears that a photocopying or scanning error may be the reason for the missing page. The missing page includes Rindahl's responses to some of the DOC defendants' statement of undisputed material facts regarding Rindahl's stomach wound. See Doc. 263 ¶¶ 36–38. Because this Court has no reason to believe that Rindahl is at fault for the missing page, this Court will assume that Rindahl disputes paragraphs 36–38 of the DOC defendants' statement of undisputed material facts. But Rindahl must do more than simply state that he disputes one of the paragraphs of the DOC defendants' statement of undisputed facts. For each paragraph that he disputes, Rindahl must include appropriate citations to the "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials[]" to demonstrate a material fact on which there exists a genuine material issue to be tried. Fed. R. Civ. P. 56(c)(1)(A); D.S.D. Civ. LR 56.1(B).

In determining whether there is a genuine issue of material fact related to the management of Rindahl's stomach wound, this Court has considered the relevant portions of Rindahl's affidavit, Doc. 278, and the Court also reviewed the attachments to Rindahl's "Affidavit of Relevant Documentary Evidence," Doc. 279-1, to confirm that none of the documentary evidence relates to

7

the management of his stomach wound.[3] Finally, to ensure that this Court is construing the facts in the light most favorable to Rindahl, the Court has considered the relevant record evidence regarding Dr. Brozik's motion for summary judgment because Dr. Brozik is an outside provider who evaluated and treated Rindahl's abdominal wound. See Docs. 154, 156, 157.

Rindahl has an extensive history of abdominal surgeries following a gunshot wound in 1988. Doc. 261-22 at 1–2. As a result, he has a chronic abdominal wound that will not heal. Id. On November 10, 2021, Dr. Michael Brozik, a general surgeon who practices at The Surgical Institute of South Dakota, P.C. (SI), saw Rindahl at SI for evaluation of the chronically draining abdominal wound. Doc. 156 ¶¶ 3, 5; Doc. 176 ¶ 4. Rindahl reported to Dr. Brozik that he had ongoing intermittent drainage from a punctate opening in his upper abdominal wall since 2014. Doc. 156 ¶ 5. Rindahl also reported that Dr. Fullerton had evaluated him in 2019 for the same condition and concluded that the drainage was secondary to a chronic mesh infection. Id. According to Rindahl, Dr. Fullerton recommended against operative intervention. Id. Dr. Brozik reviewed a CT scan Rindahl had undergone in July 2021. Id. ¶ 6; Doc. 278 at 8. The CT scan showed some inflammatory changes within subcutaneous tissues but no other obvious abnormalities. Doc. 156 ¶ 6. However, the CT scan revealed that Rindahl's right rectus muscle appeared to have atrophied completely. Id.

Based on his examination of Rindahl and review of the July 2021 CT scan, Dr. Brozik concluded that if Rindahl had a chronic mesh infection, an exploratory laparotomy with mesh explantation was the only treatment option. Id. ¶ 7; Doc. 278 at 8. But because of Rindahl's

---

[3] Because Rindahl's complaint, Doc. 1, is not verified, this Court has not considered the allegations in his complaint. Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").

multiple previous abdominal surgeries and completely atrophied right rectus muscle, an exploratory laparotomy would be complicated and would likely result in a bowel injury, requiring resection. Doc. 156 ¶ 7. The atrophied right rectus muscle would make achieving abdominal wall closure quite difficult. Id. In Dr. Brozik's opinion, an exploratory laparotomy would have a high likelihood of morbidity and would likely cause further wound problems for Rindahl, including a possible enterocutaneous fistula. Id. Dr. Brozik, therefore, advised Rindahl that he was not a surgical candidate and recommended that Rindahl continue to treat his chronically draining abdominal wound with local wound care. Id. ¶ 8. According to Rindahl's affidavit, Dr. Brozik initially advised Rindahl that he "needed corrective measures, to later recant the need, and advised . . . [him] of daily wound cleaning and dressing change." Doc. 278 at 8. For the next 1000 days, Rindahl avers that he "has either had to have a nurse, or do it himself, go through daily wound cleaning and dressing change. In some cases more than (3) times a day." Id.

On January 9, 2023, Rindahl was evaluated in health services by a provider, who is not a defendant, for his chronic abdominal wound. Doc. 261-22; Doc. 263 ¶ 35; Doc. 278 at 8. Rindahl expressed concern with the ongoing abdominal wound that had not healed with conservative treatment and questioned what the next step is. Doc. 261-22 at 3. At times, according to Rindahl, fluid or blood leaks from the area, and the area will scab over but not fully heal. Id. At the time of the January 9, 2023, encounter, Rindahl did not report any systemic symptoms such as fevers, chills, or feeling unwell. Id.; Doc. 263 ¶ 38. On examination, the provider noted a 1 X 1 inch scab that fell off while cleaning the area. Doc. 261-22 at 3; Doc. 278 at 8. After the scab fell off, the provider noted a superficial open lesion with some yellow drainage present. Doc. 261-22 at 3; Doc. 278 at 8. The provider planned to have nursing apply betadine daily to the area and instructed

9

Rindahl to keep the area clean and to avoid manipulating the area. Doc. 261-22 at 3. The provider also requested approval for a CT scan and surgical consult. Id.; Doc. 278 at 8.

Rindahl was scheduled to see Dr. Brozik on January 13, 2023, for his chronic abdominal wound. Doc. 156 ¶ 9. Rindahl (apparently for reasons outside of his control) did not timely present for this appointment, so Dr. Brozik did not evaluate him.[4] Id.; see also Doc. 157-1. After Rindahl did not present for his scheduled appointment, Dr. Brozik, in a letter, advised the Department of Corrections that he did not need to see Rindahl again because Rindahl was not a surgical candidate. Doc. 156 ¶ 10. Dr. Brozik's letter explained why he did not believe that Rindahl was a surgical candidate and repeated what Dr. Brozik had informed Rindahl at the time of the November 21, 2021, evaluation. Doc. 157-2. Since his scheduled appointment with Dr. Brozik, Rindahl "has suffered from uncontrolled bleeding and puzz [sic], stomach fevers and sickness." Doc. 278 at 9. In addition, "[w]ithin some case of the Nursing Staff, Rindahl has reported a continued expending degrading condition to which said unknown nursing staff has failed, or refused to transfer the condition the Medical provider . . . for follow-up." Id.

### 5.   Left Knee Pain

Rindahl alleges that correctional personnel injured his left knee in 2013. Doc. 1 at 22; Doc. 278 at 9. In the years before this action was commenced, Rindahl was seen in health services for the chief complaint of knee pain multiple times. Doc. 263 ¶ 39. Health services has repeatedly recommended that Rindahl attend physical therapy for his knee pain. Id. ¶ 40. Rindahl frequently refused to attend physical therapy because he did not believe it helped his pain. Doc. 261-32; Doc. 263 ¶ 41; Doc. 277 ¶ 41. According to Rindahl, his knee injury is not a muscle injury, but "more

---

[4] In his affidavit, Rindahl claims that a correctional officer, who is not a defendant, transported him to Dr. Brozik's office on January 13, 2023, and had a conversation with Dr. Brozik's office personnel. Doc. 278 at 9.

10

of injury/damage to the joint itself and a ripping tendon." Doc. 278 at 10. Although Rindahl's description of his injury is set forth in an affidavit, he is not competent to diagnose the nature of his knee injury. Nor is he competent to opine whether physical therapy is "nonproductive, adding to the pain when not a muscle related condition." Doc. 277 ¶ 40.

Rindahl was seen in health services on November 15, 2019, for left knee pain. Doc. 261-24 at 3–4; Doc. 263 ¶ 44. An x-ray was performed on November 20, 2019, which showed trace joint effusion. Doc. 261-25 at 2; Doc. 263 ¶ 46. The provider, who is not a defendant, performed an examination and submitted a utilization management request for an orthopedic consult. Doc. 261-25 at 2; Doc. 263 ¶ 46. The orthopedic consult was not approved, and Rindahl was scheduled for a provider visit to discuss his left knee pain and a plan of care. Doc. 261-34 at 3; Doc. 263 ¶ 47. Rindahl alleges, but does not provide any evidence, that he was initially informed that the orthopedic surgery consult was approved, but was later "informed that the SD DOC Administration had shot it down [due] to restrictive movement, related to Covid 19." Doc. 277 ¶ 43; see also Doc. 1 at 23. Rindahl also alleges that the "CDC had never classified South Dakota as a Lockdown State." Doc. 277 ¶ 43; Doc. 1 at 23.

On March 31, 2020, Rindahl was seen in health services for a periodic physical examination and to discuss his left knee pain. Doc. 261-26 at 1–2; Doc. 263 ¶ 48. The provider documented that an x-ray "showed some minimal changes but there was noted to be some evidence of a mild effusion as well as some calcification of the proximal patellar tendon. Otherwise, the joint appeared to be well preserved." Doc. 261-26 at 2. Rindahl reported that he continued to experience left knee pain, but did not want to consider moving from the third floor so that he did not have to ambulate stairs. Id. Rindahl did not report any significant swelling. Id. On examination, Rindahl demonstrated full range of motion of his left knee and "the medial and lateral

11

knee supports appear[ed] to be intact." Id. The provider requested approval for physical therapy to evaluate and treat Rindahl's left knee symptoms. Id. at 3.

According to the record, Rindahl did not seek treatment for left knee pain until nearly a year and a half later. On October 20, 2021, Rindahl presented to health services reporting left knee instability. Doc. 261-27 at 1. Rindahl requested a knee sleeve, and the provider recommended rest, ice, compression, and elevation. Id. at 3. Rindahl reported pain but stated that his pain was well controlled with Tylenol and celexicob (Celebrex). Id. at 1. Other conservative measures, including strengthening and stretching exercises, were recommended, and work restrictions were ordered. Doc. 261-35 at 3. Rindahl was scheduled for a recheck in six weeks. Id.

On December 2, 2021, Rindahl was seen for a nursing recheck of his left knee. Doc. 261-28 at 1. Rindahl reported that he was still having issues and stated that conservative measures, including physical therapy, were not working.   Id. He requested an orthopedic surgery consult. Id. Shortly after the nursing recheck, a provider in health services evaluated Rindahl for left knee pain. Doc. 261-29. The provider, who is not a defendant, informed Rindahl that a December 9, 2021, x-ray demonstrated "mild changes of patellofemoral osteoarthritis of both knees and enthesopathy at the upper pole of both patellae." Id. at 2. The provider also noted that Rindahl was taking Celebrex twice daily for his left knee pain. Id. When the provider examined Rindahl's left knee, there was no effusion, range of motion was relatively stable, and the joint was stable. Id. at 3. Rindahl was ambulatory and did not have a gait disturbance. Id. at 2–3. The provider requested approval for an orthopedic consult. Id. at 3.

The orthopedic consult request was denied with a recommendation to have physical therapy evaluate his knee pain. Doc. 261-30 at 2. Although Rindahl had attended physical therapy in 2020, because the prior physical therapy evaluations had been done more than a year before, the

provider recommended that Rindahl undergo an up-to-date physical therapy assessment. Id. at 3. Rindahl agreed to attempt physical therapy again. Id. at 2. The provider ordered that Rindahl continue Tylenol and Celebrex as prescribed for pain and adhere to activity restrictions. Id. at 3. Shortly after this visit, however, Rindahl declined physical therapy. Doc. 261-32 at 12.

On March 10, 2022, Rindahl was seen in health services for a routine physical examination to evaluate his chronic medical conditions. Doc. 261-15 at 1. Rindahl requested and received renewals of Tylenol and Celebrex, the medications he was taking for joint pain. Id. at 2, 7. The provider instructed Rindahl to return to health services if he changed his mind about physical therapy for his left knee pain. Id. at 7. Approximately three months later, on June 28, 2022, Rindahl returned to health services with complaints of left knee pain. Doc. 261-31 at 2. Rindahl reported his left knee pain as 2 on a scale of 10. Id. He stated that "he simply cannot trust the knee" and was more concerned about instability than pain. Id. The provider examined Rindahl's left knee and noted tenderness, but no swelling, deformity, laxity, or limited range of motion. Id. at 3. The provider's assessment was that the left knee examination was "very benign." Id. at 4. According to the provider, no further imaging studies were warranted, but the provider did order a left knee brace to provide more stability. Id.

### 6.    Rib Pain

On December 10, 2019, Rindahl requested to be seen during sick call and reported that his right side lower ribs had "cracked/snapped" due to side effects of the flu or cold. Doc. 277 ¶ 71; Doc. 279-1 at 118. An imaging study was performed on December 11, 2019, which revealed no acute findings. Doc. 277 ¶ 72. But Rindahl contends that radiologist's report is "false."[5] Id. On

---

[5] This Court granted the radiologist's motion for summary judgment and dismissed Rindahl's claims against Dr. Fritz, the radiologist who interpreted the December 11, 2019, x-ray.

January 30, 2020, Rindahl was seen in health services for complaints of rib pain and tenderness after bending over. Doc. 261-36; Doc. 263 ¶ 72; Doc. 277 ¶ 72. An examination was performed, and x-rays were ordered. Doc. 261-36; Doc. 263 ¶ 72; Doc. 277 ¶ 72. Rindahl returned to health services for rib pain on June 1, 2020. Doc. 263 ¶ 73; Doc. 277 ¶ 73. After assessing Rindahl, a nurse requested that a provider review Rindahl's chart and recommended Tylenol for pain. Doc. 261-37 at 3; Doc. 263 ¶ 73; Doc. 277 ¶ 73. Following the chart review, Rindahl was evaluated by a provider in health services. Doc. 261-38 at 2. The provider, who is not a defendant, noted that Rindahl's history includes a gunshot wound to the right side of his abdomen and several abdominal surgeries to repair the damage. Doc. 263 ¶ 74; Doc. 277 ¶ 74. Additionally, bullet fragments remain in Rindahl's abdomen. Doc. 263 ¶ 74; Doc. 277 ¶ 74. The provider requested a CT of the abdomen and pelvis. Doc. 263 ¶ 74; Doc. 277 ¶ 74.

After the abdominal/pelvic CT was performed, Rindahl met with a provider, who is not a defendant, in health services to discuss the results. Doc. 261-39. The provider informed Rindahl that the radiologist who interpreted the August 10, 2020 CT of the abdomen/pelvis stated the "impression was that of some shrapnel on the right upper abdominal wall as well as in the right posterior para spinous soft tissues." Id. at 2. The radiologist commented that the shrapnel might account for the area of concern. Id. The provider recommended a surgical consult. Id. The consulting surgeon, Dr. Fullerton, determined that there was nothing that could be done surgically to improve Rindahl's pain. Doc. 261-45.

According to Rindahl, the radiologist who interpreted the August 10, 2020 CT of the abdomen/pelvis also noted an "Old 11th Right Lateral Rib Fracture." Doc. 277 ¶ 75. Rindahl

---

Doc. 239 at 18–20. This Court noted that there is no genuine issue of fact regarding Rindahl's allegation that the report is false. Id. at 19.

14

contends that the old rib fracture, not the shrapnel, was causing his pain and demanded that it be investigated. Doc. 263 ¶ 77; Doc. 277 ¶ 80. On September 16, 2020, when Rindahl was seen in health services for a chronic care visit, he expressed concern that the old right 11th lateral rib fracture had not been noted on the x-rays that were performed on December 11, 2019, and February 3, 2020, and questioned whether his chronic pain was related to the old rib fracture. Doc. 261-40 at 2. The provider explained that a rib fracture would be more evident on a CT scan than on a plain x-ray. Id. The provider also explained that the shrapnel and Rindahl's previous abdominal surgeries, not the old rib fracture, are more likely the cause of his chronic pain. Id.

On July 11, 2021, Rindahl reported "swelling within the liver area" and "tissue ripping in area of right lateral rib cage[.]" Doc. 261-41 at 1. After assessing Rindahl, a nurse requested that a provider review his chart. Doc. 263 ¶ 79; Doc. 277 ¶ 79. A provider, who is not a defendant, evaluated Rindahl on July 19, 2021. Doc. 261-42; Doc. 263 ¶ 80; Doc. 277 ¶ 80. The provider reiterated that the most likely cause of Rindahl's pain is the remaining shrapnel, but Rindahl disagreed. Doc. 261-42 at 2. The provider recommended weight loss because Rindahl has "central adiposity" that can put pressure on the previous surgical sites. Id. at 4. The provider also requested a repeat abdominal CT to evaluate for any possible changes. Id.

Approximately a year later, on June 28, 2022, Rindahl presented to health services with rib pain. Doc. 261-31. He reported that he has had rib pain since 2020, when he contends he sustained a rib fracture. Id. at 2. According to Rindahl, his 2020 rib fracture still had not healed. Id. at 2–3. The provider, who is not a defendant, educated Rindahl on bone fractures, explaining that they typically do not take two years to heal. Id. at 4. But the provider was not able to rule out soft tissue discomfort due to shrapnel. Id. The provider ordered a repeat x-ray for Rindahl's peace of

15

mind and indicated that no further treatment is necessary for the right-sided rib pain other than modifying activity as needed and avoiding heavy straining.  Id.

### D.     First Amendment Free Speech Claim (Disciplinary Punishment)

Rindahl alleges that he was falsely accused of and found guilty of an L-44 charge for refusing housing.[6]  Doc. 1 at 33–52.  The Offender Discipline System Policy No. 300-17 sets forth the adjudication process for inmates suspected of engaging in conduct and behavior that violates DOC policy or institutional rules.  Doc. 261-3; Doc. 263 ¶ 7; Doc. 277 ¶ 7.  Policy No. 300-17 provides that an inmate's privileges may be restricted as a disciplinary sanction for violating prison rules.  Doc. 261-3 at 3–5, 14; Doc. 263 ¶ 8; Doc. 277 ¶ 8; see also SDCL § 24-2-9(4).  Privileges motivate inmates, and withholding privileges as a disciplinary sanction deters prison rule violations.  Doc. 263 ¶ 11.  Rindahl asserts, without citation to any record evidence, that restricting privileges as a disciplinary sanction is demoralizing, degrading, and, in some cases, can result in an inmate acting out.  Doc. 277 ¶ 11.  After Rindahl was found guilty of the L-44 charge, some of Rindahl's privileges, including phone calls and messaging, were restricted for 180 days.  Doc. 1-1 at 30.

## II.     DOC Defendants' Motion for Summary Judgment

### A.     Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party[.]"  True v. Nebraska, 612

---

[6] Rindahl's Eighth Amendment claim and his Fourteenth Amendment Due Process claims arising out of the L-44 charge and subsequent discipline did not survive § 1915A screening.  Doc. 12 at 38–43.

F.3d 676, 679 (8th Cir. 2010) (citation omitted). There is a genuine issue of material fact if "a reasonable jury [could] return a verdict for either party[]" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011) (citation omitted). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

### B.    Qualified Immunity

The DOC defendants argue that they are entitled to summary judgment because Rindahl has "failed to demonstrate a violation of a clearly established constitutional right[.]" Doc. 261 at 7. State officials sued in their individual capacities for monetary damages under § 1983 may be entitled to qualified immunity as a defense. Qualified immunity "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014) (citation omitted). To determine whether a government official is entitled to qualified immunity, the court considers (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). The court may consider the elements in any order, and if either of the elements is not met, then the official is entitled to qualified immunity. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Rindahl cannot recover monetary damages from

17

defendants in their individual capacities if defendants are entitled to qualified immunity, but "[q]ualified immunity does not apply to a claim for injunctive relief.[]" Hamner v. Burls, 937 F.3d 1171, 1175 (8th Cir. 2019). Because some of Rindahl's remaining claims seek only injunctive relief against some of the defendants in their official capacities, this Court will begin its analysis of each of Rindahl's claims by considering whether the facts alleged, viewed in the light most favorable to Rindahl, demonstrate that the conduct at issue violated Rindahl's constitutional rights.

## C.    First Amendment Free Speech Claim (Telephone Policy)

Rindahl alleges that the DOC's telephone policy violates his First Amendment free speech rights because the policy does not permit inmates to call numbers not on the inmate's designated contact list, and the policy limits an inmate's designated contact list to fifteen separate numbers. Doc. 9 at 1–4. Rindahl contends that he was prevented from contacting Mayo Clinic to attempt to secure a medical expert to pursue a legal claim because of the policy. Id. at 3; Doc. 279-1 at 1–2. The United States Court of Appeals for the Eighth Circuit has stated that while inmates may have a right to use the telephone in some instances, "it is a perilous over-generalization" to declare that inmates have a First Amendment right to telephone access. See Holloway v. Magness, 666 F.3d 1076, 1079 (8th Cir. 2012); see also Benzel v. Grammer, 869 F.2d 1105, 1108 (8th Cir. 1989) (stating that a "prisoner has no right to unlimited telephone use[,]" and prison officials may restrict a prisoner's right to use the telephone to communicate with relatives and friends in the face of legitimate security and rehabilitation concerns). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment[.]" Jones v. N.C. Prisoners' Lab. Union, Inc., 433 U.S. 119, 125 (1997). "While prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights because of the needs of the penal system." Kaden v. Slykhuis, 651 F.3d 966, 968 (8th Cir. 2011)

18

(per curiam) (citation omitted). In Turner v. Safley, the Supreme Court of the United States held that prison rules and restrictions on First Amendment rights are constitutional only "if [they are] reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The Turner Court provided four factors to determine whether a prison regulation withstands scrutiny:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

Thongvanh v. Thalacker, 17 F.3d 256, 259 (8th Cir. 1994). In Turner, the Supreme Court recognized that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turner, 482 U.S. at 85–86. "Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." Id. at 86.

Here, the DOC has provided evidence that permitting inmates to contact only individuals on their approved contact lists is related to a legitimate penological concern—maintaining safety and security of the institution. Doc. 262 ¶ 9; Doc. 263 ¶ 5; Doc. 277 ¶ 5. Further, there is evidence that the DOC cannot adequately monitor inmate telephone communications if an inmate's designated contact list is not limited. Doc. 263 ¶ 5. The United States Court of Appeals for Eighth Circuit has held that monitoring inmates' outgoing calls is reasonably related to a legitimate penological interest and does not violate an inmate's constitutional rights. Beaulieu v. Ludeman, 690 F.3d 1017, 1039–40 (8th Cir. 2012); see also U.S. v. Conley, 531 F.3d 56, 59 (1st Cir. 2008) (citing Turner and holding that monitoring an inmate's phone calls was justified based on the need for safety and security); Evans v. Martin, 496 F. App'x 442, 446–47 (5th Cir. 2012) (per curiam)

19

(describing how inmate phone calls are  monitored "to preserve the security and orderly management of the institution and to protect the public." (citation omitted)).

Inmates have adequate, alternative means to exercise their First Amendment rights, such as writing letters. Rindahl has not come forward with any evidence to raise any genuine factual dispute that writing to Mayo Clinic is not an adequate, alternative means to attempt to secure an expert review or to otherwise communicate with his family and friends. This Court is not inclined to second-guess the Secretary of Corrections' explanation of the legitimate penological interests served by a telephone policy restricting inmates from contacting numbers not on their designated contact list as well as limiting the number of separate telephone numbers on a designated contact list. Doc. 262 ¶ 9. Defendants Roemmich and Wasko are entitled to summary judgment on Rindahl's official capacity First Amendment free speech claim challenging the DOC's telephone policy.

**D.     First Amendment Access-to-the-Courts Claim**

Rindahl's First Amendment access-to-the-courts claim arises out of the DOC's decision to dispose of all "South Dakota Codified Law Publications" and the United States Code. Doc. 1 at 6–7. Rindahl also contends that the tablet that the DOC provided him to electronically access a legal research database was broken and not repaired or replaced. Id. at 7–9; Doc. 9 at 9–11. According to Rindahl's complaint, he was unable to pursue Wisconsin and California civil cases because legal materials available at the DOC are inadequate. Doc. 1 at 7–9 (alleging that he was unable to pursue a Wisconsin civil proceedings and a probate proceeding); Doc. 1 at 12–13 (alleging interference with a Wisconsin probate proceeding relating to a specials needs trust); Doc. 9 at 10 (alleging that he could not pursue a civil/tort/medical malpractice action in California because he did not comply with local court rules); Doc. 9 at 11 (alleging that a Wisconsin state

20

court returned a medical malpractice/negligence complaint because he failed to comply with Wisconsin local court rules).

"The Constitution guarantees prisoners a right to access the courts." White v. Kautzky, 494 F.3d 677, 679 (8th Cir. 2007). But this right is not absolute. "Meaningful access to the courts is the capability to bring 'actions seeking new trials, release from confinement, or vindication of fundamental civil rights.'" Id. at 680 (quoting Bounds v. Smith, 430 U.S. 817, 827 (1977), overruled on other grounds by Lewis v. Casey, 518 U.S. 343, 354 (1996)). "For prisoners, meaningful access to the courts 'requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" Id. at 679–80 (quoting Bounds, 430 U.S. at 828). The United States Court of Appeals for the Eighth Circuit has recognized that prisoners do not have a right to affirmative assistance from prison authorities in the form of access to a law library or appointment of a lawyer or law-trained assistant to pursue or defend legal state-law tort claims. Schrier v. Halford, 60 F.3d 1309, 1313 (8th Cir. 1995). As the Supreme of the United States has explained:

> Bounds does not guarantee inmates the wherewithal to transform themselves into litigation engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Lewis, 518 U.S. at 355 (emphasis in original). Because Rindahl does not contend that allegedly inadequate legal materials impaired his ability to attack his sentence, directly or collaterally, or impaired his ability to challenge his conditions of confinement, Defendants Roemmich and Wasko

21

are entitled to summary judgment on Rindahl's official capacity First Amendment access-to-the-courts claim.

### E.    Eighth Amendment Deliberate Indifference to Serious Medical Needs Claim

#### 1.    Legal Standard

To succeed on his deliberate indifference claim, Rindahl must show that (1) he suffered "an objectively serious medical need[]" and (2) that each "defendant actually knew of, but deliberately disregarded, such need." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009) (quoting Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009)). "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).

The second element of deliberate indifference requires a showing that the defendant "deliberately disregarded" the serious medical need, which is a greater burden than showing mere negligence. McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012) (citing Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)). To satisfy the second element, Rindahl must demonstrate that the defendant "recognized that a substantial risk of harm existed *and* knew that [his] conduct was inappropriate in light of that risk." Shipp v. Murphy, 9 F.4th 694, 703 (8th Cir. 2021) (emphasis in original) (quoting Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015)). Rindahl must show that the defendant's mental state was "akin to criminal recklessness." McCaster, 684 F.3d at 746 (internal quotation omitted). When evaluating whether a defendant displayed deliberate indifference to a plaintiff's serious medical needs, a court considers the defendant's "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the

22

defendant's] position[,] and alternative courses of action that would have been apparent to an official in that position." Letterman, 789 F.3d at 862 (quoting Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000)). Examples of "[d]eliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cnty., 452 F.3d 978, 983 (8th Cir. 2006) (quoting Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995)). "[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Alberson, 458 F.3d at 765). "Prisoners do not have a constitutional right to any particular type of treatment." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). Prison doctors "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." Id. at 765 (citation omitted).

The Eighth Circuit has instructed that "[w]hen there are multiple defendants who played limited roles in the conduct complained of, the determination of whether an individual defendant is entitled to qualified immunity is based upon that defendant's knowledge and conduct at the time or times he or she participated in that conduct." Cannon v. Dehner, 112 F.4th 580, 586 (8th Cir. 2024). Because deliberate indifference is a subjective inquiry, a district court must "assess each defendant's 'knowledge at the time in question, not by hindsight's perfect vision.'" Id. at 587 (quoting Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011)). Rindahl contends that four defendants, in their individual capacities, acted with deliberate indifference to at least six different serious medical needs over a period of years. Doc. 1 at 13–32. But neither the DOC defendants' statement of facts nor their brief makes any attempt to outline what, if any, involvement each of

23

the four remaining defendants had regarding any of the six medical conditions in issue.[7] See generally Docs. 261, 263. None of the defendants submitted affidavits outlining his or her specific (or lack thereof) involvement with any of Rindahl's medical conditions. Most, if not all, of the medical records on which the DOC defendants rely to argue that they did not deliberately disregard Rindahl's serious medical needs and properly treated Rindahl involve providers who are not defendants. See Doc. 261-15 at 9; Doc. 261-18 at 6; Doc. 261-20; Doc. 261-22; Doc. 261-24; Doc. 261-26; Doc. 261-27; Doc. 261-28; Doc. 261-29; Doc. 261-30; Doc. 261-31; Doc. 261-36; Doc. 261-37; Doc. 261-38; Doc. 261-39; Doc. 261-40; Doc. 261-41; Doc. 261-42; Doc. 261-45. Neither Rindahl nor the defendants have made any attempt to demonstrate whether any of the remaining defendants actually had knowledge of any objectively serious medical need and deliberately disregarded such need. Thus, it is difficult for this Court to comply with the Eighth Circuit's directive when considering whether any of the nine defendants sued in their individual capacities are entitled to qualified immunity on Rindahl's Eighth Amendment deliberate indifferent claim.

## 2.  Broken Left Jaw

Although Rindahl has alleged his left jaw was broken in July 2014, he has not come forward with any competent evidence to support this allegation. In fact, the July 2014 radiology report Rindahl attached to his complaint specifically states that no abnormalities are noted. Doc. 1-1 at 31. Further, Rindahl has not come forward with any competent evidence that any of the

[7] Tellingly, none of the four defendants are mentioned by name in the 65 paragraphs of the DOC defendants' statement of undisputed facts regarding the medical conditions and medical care in issue. Doc. 263 ¶¶ 16–18. Similarly, none of the four defendants are mentioned by name in the portions of the DOC defendants' summary judgment brief addressing Rindahl's Eighth Amendment deliberate indifference claim. Doc. 261 at 15–21.

24

remaining defendants[8] were actually aware of the alleged left jaw injury, but deliberately disregarded it. Finally, even if Rindahl could point to some evidence that any of the defendants were aware of the alleged July 2014 left jaw injury, Rindahl's Eighth Amendment deliberate indifference claim arising of this alleged injury is time-barred.

While § 1983 does not contain a specific statute of limitations, the Supreme Court of the United States has instructed courts to apply the most analogous state statute of limitations to claims made under § 1983. Wilson v. Garcia, 471 U.S. 261, 266–68 (1985). South Dakota has a specific statute of limitations governing civil rights actions and requiring such actions to be brought within three years after the alleged constitutional deprivation occurred. SDCL § 15-2-15.2; see also Bell v. Fowler, 99 F.3d 262, 266 (8th Cir. 1996). This action was commenced in June 2022. Doc. 1. Rindahl's Eighth Amendment deliberate indifference claim arising of the alleged failure to treat his 2014 left jaw injury is time-barred.[9]

### 3.   Vessel Ischemic Disease

In his affidavit, Rindahl avers that DOC Health Services Nursing Staff and SD DOC Health Services took "a passive approach" to his complaints of headaches, balance and vision issues, and CT findings consistent with vessel ischemic disease. Doc. 278 at 6. But claims based on vicarious liability are not cognizable under 42 U.S.C. § 1983. Marsh v. Phelps Cnty., 902 F.3d 745, 754 (8th Cir. 2018). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must

---

[8] In his complaint, Rindahl generally alleged that Ponto, Benting, Clark, and Sullivan directly participated in the alleged Eighth Amendment violation. Doc. 1 at 13–32. But the allegations in Rindahl's complaint, at the summary judgment stage, are insufficient. Rindahl must point to record evidence, not allegations.

[9] Rindahl contends that he has a serious mental illness and that the statute of limitations is tolled under SDCL § 15-2-22(2). Doc. 278 at 11. Rindahl has previously raised this argument, and the Court has rejected it. Doc. 193 at 10; Doc. 247 at 8–9. For the same reasons, Rindahl's argument that the statute of limitations applicable to his deliberate indifference claim arising out of the July 2014 alleged jaw fracture is tolled fails.

25

plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)); Jones v. City of St. Louis, 104 F.4th 1043, 1050 (8th Cir. 2024). In other words, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Marsh, 902 F.3d at 754 (quoting Ashcroft, 556 U.S. at 677).

While non-medical prison officials may be liable for deliberate indifference to a prisoner's serious medical needs, the prisoner must come forward with evidence that creates a genuine issue of material fact on both the objective and subjective components. In other words, Rindahl must demonstrate that each of the SD DOC officials he alleges were deliberately indifferent to his medical needs "actually knew of but deliberately disregarded those needs." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citation omitted). Rindahl has not come forward with any evidence that Sullivan, Ponto, Benting, or Clark were actually aware of and deliberately indifferent to his vessel ischemic disease. Rather, Rindahl seeks to hold these defendants liable in their individual capacities based on his allegations that SD DOC Administration and Administrative Personnel did not act. Doc. 278 at 6, 7.

Even assuming that there were some evidence linking any of the DOC prison officials to Rindahl's vessel ischemic disease, based on the undisputed record evidence, at most, Rindahl has established that he disagrees with the treatment he was provided and believes that he should have been provided different or additional treatment. After receiving the February 2022 CT scan noting changes consistent with chronic small vessel ischemic disease, it is undisputed that providers discussed a treatment plan with Rindahl and explained how to manage the condition effectively. Doc. 261-15 at 8; Doc. 261-17 at 2; Doc. 261-18 at 2–3; Doc. 263 ¶¶ 18, 20; Doc. 277 ¶¶ 18, 20.

26

In Rindahl's affidavit, he avers that brain ischemic disease is a "condition that suffocates the Brain of the Blood Flow, and can result within 'Dry Stroke' and Death." Doc. 278 at 6. He also states that on March 23, 2022, he "fell flat on his face into a Medal Tack Down Bench, leaving [him] with initially limited speech, and an inability to use his Right Hand for over a month." Id. Rindahl attributes the March 2022 incident to his vessel ischemic disease, but Rindahl is not a medical expert and is not competent to opine as to the cause of his vessel ischemic disease or the potential long-term sequalae of the condition. Finally, Rindahl avers that he had a CT in February 2024 that demonstrates that he has a "Brain Disease" but states that he has not received any treatment of the "Fluid Build Up on his Brain." Id. at 7. Even if in fact Rindahl has been diagnosed with a brain disease or fluid on his brain, this is insufficient to overcome Defendants' motion for summary judgment. Rindahl has not come forward with any admissible evidence that any of the remaining defendants were actually aware of and deliberately disregarded Rindahl's alleged brain disease and/or fluid on his brain.

### 4.    Thyroid Gland Nodules

Rindahl alleges that he has thyroid gland nodules which have not been appropriately treated. Doc. 1 at 20. Again, however, Rindahl does not allege and has not come forward with any admissible evidence that any of the remaining defendants were actually aware of and deliberately disregarded his thyroid gland nodules. Further, the undisputed record evidence demonstrates that Rindahl's thyroid gland nodules have been treated, although Rindahl disagrees with the course of treatment. After the thyroid gland nodules were discovered, thyroid lab studies were performed and were normal. Doc. 263 ¶¶ 30, 31. Rindahl was scheduled for an ultrasound

27

of his thyroid and saw an endocrinology specialist.[10] Doc. 261-20 at 1; Doc. 261-22; Doc. 263 ¶¶ 32–33; Doc. 277 ¶¶ 32–33. Although Rindahl's nodules were benign, health services planned annual follow-up ultrasounds. Doc. 261-18 at 1, 6.

Rindahl contends that an imaging study performed on November 8, 2022 "clearly shows a Thyroid encompassing nearly the whole air way of the plaintiff, at time[s] suffocating the plaintiff[.]" Doc. 277 ¶ 34 (citing Doc. 279-1 at 115). Rindahl is not competent to interpret an imaging study. Thus, his lay interpretation of the November 8, 2022, imaging study does not create a genuine issue of material fact. Notably, Rindahl did not produce a radiology report to corroborate his interpretation of the November 8, 2022 imaging study.

In his affidavit, Rindahl states that he underwent a complete thyroid removal in May 2024 and contends that the alleged delay in removing his thyroid has caused "an additional Tumor within the side of [his] neck[.]" Doc. 278 at 8. When an inmate seeks to recover for an alleged delay in treatment, the inmate must place verifying medical evidence in the record to show that there was a detrimental effect caused by the delay. Jackson v. Riebold, 815 F.3d 1114, 1119–20 (8th Cir. 2016). If an inmate fails to submit verifying medical evidence that any alleged delay in treatment resulted in an adverse effect, the inmate cannot overcome a motion for summary judgment. Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006) ("To avoid summary judgment an inmate alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect." (citation omitted)). Here, Rindahl has not submitted any medical evidence regarding the impact of any alleged delay in removing his thyroid.

---

[10] In his affidavit, Rindahl includes statement the outside endocrinologist allegedly made, see Doc. 278 at 7–8, but these hearsay statements are insufficient to create a genuine issue of material fact. Brooks v. Tri-State Sys., Inc., 425 F.3d 1109, 1111 (8th Cir. 2005) (stating that when an affidavit contains inadmissible hearsay, the hearsay statement may not be used to defeat a motion for summary judgment).

### 5.    Stomach Wound

Although Rindahl has a chronic abdominal wound that will not heal, there is no evidence that Rindahl's ongoing wound issues are due to deliberate indifference.[11] Rather, it is undisputed that Rindahl's ongoing abdominal wound issues stem from the fact that he is not a surgical candidate and conservative local wound care, which Rindahl has received, is the only viable treatment option. Doc. 156 ¶¶ 7–8, 10; Doc. 157-2; Doc. 261-22. In his affidavit, Rindahl states that he "has suffered from uncontrolled bleeding and puzz [sic], stomach fevers and sickness[]" since his last scheduled appointment with Dr. Brozik on January 13, 2023. Doc. 278 at 9. Even assuming Rindahl has continued to experience symptoms related to his chronic abdominal wound, there is no genuine issue of material fact because there is no evidence that any of the remaining defendants were aware of these ongoing symptoms and deliberately disregarded them. Rindahl states that he has made unknown nursing staff personnel aware of these symptoms, but these unknown nursing staff personnel are not defendants, and Rindahl concedes that the unknown nursing staff refused to pass along Rindahl's complaints for follow up. Id.

### 6.    Left Knee Pain

As with the other medical conditions in issue, Rindahl has not come forward with any admissible evidence that any of the remaining defendants were actually aware of and deliberately disregarded his complaints of left knee pain. It is undisputed that Rindahl's left knee pain has been evaluated and assessed, and he has been offered treatment, although not the treatment of his choice. Doc. 263 ¶¶ 39-41, 44, 46, 48; Doc. 261-15; Doc. 261-26; Doc. 261-27; Doc. 261-29; Doc. 261-31; Doc. 261-32; Doc. 261-35. Rindahl does not have a constitutional right to the treatment of his

---

[11] Again, neither of the parties have provided this Court with evidence regarding whether any of the remaining defendants were actually aware of and deliberately disregarding Rindahl's chronic abdominal wound issues.

choice. Long, 86 F.3d at 765. Although Rindahl did not believe that physical therapy was an appropriate treatment for his knee because he does not have a "muscle related condition," Doc. 277 at 9–10, Rindahl's "unsupported medical conclusions cannot create a question of fact about whether the defendants' medical decisions were reasonable, negligent, grossly negligent, or so ineffective as to be criminally reckless, rising to the level of deliberate indifference." Redmond v. Kosinski, 999 F.3d 1116, 1121 (8th Cir. 2021).

In his affidavit, Rindahl states that he "has continued to suffer from wanton infliction of pain and suffering directly related to SD DOC Administration inability to provide pain management without billing the plaintiff." Doc. 278 at 10. To support this statement, Rindahl cites to "Pain 1 & 2" exhibits, Doc. 279-1 at 116–17. The supporting exhibits are correspondence from health services, dated December 30, 2023, and January 2, 2024, informing Rindahl that Tylenol orders are no longer being renewed by health services and the item should be purchased from commissary. Id. In his complaint, Rindahl did not allege that requiring him to purchase Tylenol or any other over-the-counter medication from commissary violates his Eighth Amendment rights. See generally Doc. 1. A plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." Christians v. Young, 4:20-CV-04083-LLP, 2024 WL 5694328, at *12 (D.S.D. Sept. 30, 2024) (citing Bragg v. Husqvarna Forestry Prods., N.A., 2021 WL 2346012, at *3 (W.D. Ark. June 8, 2021) (citing Hildreth v. City of Des Moines, 773 F. App'x 334, 335 (8th Cir. 2019) (per curiam)); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam)). The Eighth Circuit reasoned that "while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late

30

into the litigation for the purpose of avoiding summary judgment." N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004).

Even if this Court considers the merits of this new claim, it fails. "It is well established that the Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care." Jackson v. Dameron, No. 7:22-cv-00090, 2025 WL 877558, at *8 (W.D. Va. Mar. 20, 2025) (internal quotations omitted) (quoting Poole v. Isaacs, 703 F.3d 1024, 1026 (7th Cir. 2012)). In Jackson, the court found no Eighth Amendment violation when an inmate's prescription medications were discontinued and he was informed that he could purchase over-the-counter (OTC) medication from the commissary. Jackson, 2025 WL 877558, at *2, *8; see also Taylor v. Corizon Medical Services, No. 1:11-cv-1436-JMS-DKL, 2013 WL 4678670, at *3, *6 (S.D. Ind. Aug. 30, 2013) (holding that prison officials did not violate an inmate's Eighth Amendment rights when his prescription was discontinued and he was informed that he could buy comparable OTC medication at the commissary).

In this context, "a prison official violates the Eighth Amendment by refusing to provide prescribed OTC medicine for a serious medical need only if the inmate lacks sufficient resources to pay for the medicine." Taylor, 2013 WL 4678670, at *6 (quoting Hudgins v. DeBruyn, 922 F.Supp. 144, 150 (S.D. Ind. 1996)). Here, Rindahl does not claim that he lacks sufficient funds to pay for over the counter medications. Doc. 278 at 10.[12] Indeed, Rindahl paid the full civil filing

---

[12] Even if Rindahl were to allege that he has insufficient funds to purchase the over-the-counter medication, he would have to provide evidence of his actual lack of funds to pay for medication. See Jackson, 2025 WL 877558, at *8; Taylor, 2013 WL 4678670, at *5; Franklin v. Shah, No. 3:17-cv-960-GCS, 2020 WL 980238, at *7 (S.D. Ill. Feb. 28, 2020) (finding no Eighth Amendment violation when the inmate's "assertion that he was unable to afford pain medication is merely self-serving and conclusory[]").

fee of $402 on July 15, 2022. "If the inmate can afford the medicine but chooses to apply his resources elsewhere, it is the inmate, and not the prison official, who is indifferent to serious medical needs." Taylor, 2013 WL 4678670, at *6 (quoting Hudgins, 922 F. Supp. at 150).

### 7.    Rib Pain

Since Rindahl first reported that his right-side lower ribs had cracked in December 2019, Rindahl has been seen in health services a number of times for his right rib complaints. Doc. 261-31; Docs. 261-36 to 42; Doc. 263 ¶¶ 72, 73, 74, 79, 80; Doc. 277 ¶¶ 72, 73, 74, 79, 80.  But there is no evidence that any of the remaining defendants had any involvement in any of these encounters, or were aware of Rindahl's ongoing right rib complaints, let alone that they deliberately disregarded his right rib complaints. The record demonstrates that Rindahl's condition has been assessed, and that Rindahl has repeatedly been advised that it is unlikely that his pain is related to what Rindahl believes is an old rib fracture that was never treated. Doc. 261-31; Doc. 261-39; Doc. 261-40; Doc. 261-42.    That Rindahl disagrees with the diagnosis and the recommended course of treatment does not establish deliberate indifference. Langford, 614 F.3d at 460.  Moreover, it is undisputed that a consulting surgeon has determined that there is nothing that can be done surgically to improve Rindahl's pain. Doc. 261-45.

Because there is no evidence that Ponto, Benting, Clark, or Sullivan were aware of and deliberately disregard Rindahl's small vessel ischemia, thyroid gland nodules, chronic abdominal wound, chronic left knee pain, or chronic right rib pain, these defendants are entitled to summary judgment on Rindahl's Eighth Amendment deliberate indifference to serious medical needs claim.

### F.    First Amendment Free Speech Claim (Disciplinary Punishment)

Rindahl alleges that restricting his communication privileges as a disciplinary sanction violates his First Amendment free speech rights. Doc. 1 at 43.  Prison restrictions on First

32

Amendment rights are constitutional if "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. As required by Turner, the DOC defendants have articulated a legitimate penological interest furthered by the policy providing for restriction of communication privileges as a disciplinary sanction. Doc. 262 ¶ 12. Undoubtedly, prison officials must be able to enforce prison rules and regulations to operate the facility efficiently, effectively, and safely. Id. The DOC has submitted undisputed evidence that privileges, such as commissary, telephone use, and visits, are significant motivators for inmates to follow prison rules and regulations and that restricting such privileges as a disciplinary sanction deters violations. Id. ¶¶ 13, 14. Even when an inmate's communication privileges are restricted as a disciplinary sanction, the Offender Access to Telephones and Tablets Policy No. 500-05 permits inmates to communicate by telephone with their attorney and to communicate by telephone with family members in emergency situations. Doc. 261-1 at 6. The disciplinary sanction at issue did not limit in any way Rindahl's ability to communicate by mail. Doc. 1-1 at 30.

When considering similar claims, other courts have consistently held that restricting communication privileges as a disciplinary sanction does not violate an inmate's First Amendment rights. For example, in Brown v. Davis, the court held that sanctions imposed on a prisoner, including the denial of telephone use, did not violate the prisoner's First Amendment rights because the prisoner retained alternative means of communication. Brown v. Davis, No. 1:18-cv-1322, 2019 WL 211070, at *5 (W.D. Mich. Jan. 16, 2019). See also Pruitt v. Ford, No. 17-1134-JDT-CGC, 2018 WL 4059491, at *3 (W.D. Tenn. Aug. 24, 2018) (denying prisoner telephone access for two months due to placement in segregation did not violate First Amendment); Schuh v. Mich. Dep't of Corr., No. 1:09-CV-982, 2011 WL 4529641, at *9 (W.D. Mich. Sept. 30, 2011) (finding that prisoner's lack of telephone access for eleven months while confined in

administrative segregation did not violate the First Amendment). Similarly, "where the loss of telephone privileges occurred as part of disciplinary measures, and where Plaintiff has not shown that he was denied the ability to communicate with people, including his attorney, through other means, no prejudice or actual injury has been alleged." Gayle v. Harmon, 207 F. Supp. 3d 549, 554 (E.D. Pa. Sept. 13, 2016). In this case, based on the undisputed record evidence, restricting Rindahl's privileges as a disciplinary sanction does not violate his First Amendment rights.

Rindahl did not submit a brief in opposition to the DOC Defendants' motion for summary judgment, but he submitted two affidavits. Docs. 278, 279. One of Rindahl's affidavits contains what he identifies as "Relevant Documentary Evidence." Doc. 279. The relevant documentary evidence includes Rindahl's handwritten communications with DOC personnel requesting restoration of his email and telephone privileges because Rindahl asserted that restricting communication privileges as a disciplinary sanction violates his First Amendment rights. See Doc. 279-1 at 129, 163–64. This Court has reviewed the two cases Rindahl relied on in support of his request, but neither of the cases support Rindahl's argument. In Beaulieu v. Ludeman, No. 07-1535 (JRT/JSM), 2008 U.S. Dist. LEXIS 119324, at *54 (D. Minn. Feb. 8, 2008), the court recognized that "prisoners have the right to communicate with individuals outside of . . . the facility and that the use of a telephone is merely one means of exercising this right."[13] The court also noted that determining whether a restriction or limitation of the right to communicate is reasonable must be considered under the Turner factors, but a claim challenging the restriction of the right to communicate cannot be assessed at the motion to dismiss stage when no facts have been developed

---

[13] Rindahl cites Beaulieu v. Ludeman, No. 07-1535 (JRT/JSM), 2008 U.S. Dist. LEXIS 119324 (D. Minn. Feb. 8, 2008), a Report and Recommendation adopted in relevant part by Beaulieu v. Ludeman, 07-CV-1535(JMR/JSM), 2008 U.S. Dist. LEXIS 47513, at *2–3 (D. Minn. 2008). This adoption of this Report and Recommendation was later affirmed by the Eighth Circuit in Beaulieu v. Ludeman, 690 F.3d 1017 (8th Cir. 2012), referenced earlier in this opinion.

34

to address the Turner factors. Id. at 57–58. In this case, the DOC defendants presented undisputed facts regarding the Turner factors, and the restriction or limitation in this case, based on the record evidence, is reasonable.

In the other case Rindahl relies on, Benning v. Dozier, No. 5:18-CV-00087-TES-CHW, 2021 U.S. Dist. LEXIS 82957, at *12 (M.D. Ga. Apr. 30, 2021), the court stated that "prisoners have a right to communication; they do not have a right to a specific form of communication, such as telephone or email, but those forms of communication can be a way an inmate exercises his First Amendment right to communicate." The court then applied the Turner standard and rejected Benning's claim that censorship of some of his outgoing emails was unconstitutional.[14] Id. at *22– 26. Thus, the case is factually distinguishable and provides no support for Rindahl's position that restricting some, but not all, forms of communication as a disciplinary sanction is unconstitutional. Defendants Sullivan, Ponto, Benting, Jones, Yost, Schneider, Ellis, Reisch, Clark, and Rotert are entitled to summary judgment on Rindahl's individual capacity First Amendment free speech claims regarding disciplinary punishment.

**III. Conclusion and Order**

Accordingly, it is

---

[14] In Benning, the court also had to consider whether the less-deferential standard from Procunier v. Martinez, 416 U.S. 396 (1974) is the governing standard, but that issue is not present in this case because Rindahl does not allege censorship of outgoing mail or email. See Benning, 2021 U.S. Dist. LEXIS 82957, at *13–20.

35

ORDERED that the DOC defendants' motion for summary judgment, Doc. 260, is granted.

DATED this _30_ day of September, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE